# Exhibit 2




MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE INVESTIGAÇÃO E AÇÃO PENAL

| Processo: 125/18.6 TELSB | Inquérito | N/Referência: ________ |
|---|---|---|

AUTO DE INQUIRIÇÃO

**Data:** 20-03-2018- **Hora:** 10:00 horas.---

**Entidade que preside:** Micaela Branco, Inspectora da P.J.

**Entidade presente:** Agentes Especial do Departamento de HomeLand Security dos EUA, SA Steven Bodak, SA Matthew Wood, SA Thomas Cason e SA Kari Newman.

Assistem igualmente ao ato, Dr.ª Maria Celeste Rodrigues e Drª Teresa Lourenço, interpretes da Unidade de Apoio – Sector de Traduções da Procuradoria Geral da República.

**Mandatário da Testemunha:** Dr.Henrique Salinas, portador da cédula profissional n.º 10757L, com escritório na Rua Vitor Cordon n.º 10 A – 4º, Lisboa e telefone nº 96 2349319.---

*

**Identificação da testemunha:**

**Nome:** Paulo Jorge da Costa Casqueiro Murta.---

**Filiação**: João Manuel Casqueiro Murta e de Arlete da Costa Casqueiro Murta.---

**Data de nascimento:** 23-01-1965.---

**Naturalidade:** São Sebastião da Pedreira - Lisboa.---

**Nacionalidade:** Portuguesa.---

**Estado civil**: Casado.---

**Profissão:** Empresário.---

**Telefone:** 93 0571897.---

**Documento de identificação**: CC nº 07118078, válido até 03-09-2022 e NIF 141201495.-

**Domicílio:** Praçeta de Santa Vitória n.º 9 – 2750 – 064 Cascais

*

Aos costumes disse não ter relações de parentesco e de interesse com o arguido, ofendido, partes civis e outras testemunhas.

Por impossibilidade técnica não é realizada a gravação da diligência.

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL



**À matéria dos autos e após uma breve introdução sobre os factos em causa, disse:**

........ Começa por esclarecer que nunca teve relações profissionais com entidades públicas venezuelanas, apenas com clientes privados, e apenas aqueles que lhe foram apresentados pelo BES. ......................................................................................................

........ Mostra-se surpreso com esta notificação uma vez que nada tem a ver com entidades públicas venezuelanas. Não conhece ninguém que lhe tenha sido apresentado como sendo funcionário de entidades públicas, razão pela qual afirma que não compreende a razão pela qual está a ser questionado sobre esta matéria..........................................................................

........ Sendo-lhe pedido para começar por esclarecer os seus dados e percurso pessoal e profissional, esclarece que nasceu em Portugal, estudou em Portugal, viveu na Suíça. ...........

........ Esclarece que entrou para a GESTAR, Suíça, em 2006. Não tem formação superior na área financeira, embora tenha frequência universitária...............................................

........ Explicou a sua mudança para a Suíça, para onde foi em 2002. Trabalhou num hotel até 2005. Nessa data foi apresentado a Michel Ostertag, proprietário de empresa GESTAR e, em 2006, regressou à Suíça e começou a trabalhar nessa empresa. ......................................

........ Explicou que a GESTAR era propriedade de Michel Joseph Ostertag e que se dedicava à incorporação de sociedades, efectuavam trabalho de contabilidade e administrativo. A incorporação de empresas/entidades era feita por advogados externos à GESTAR. Afirma que foram criadas centenas de sociedade americanas, Delaware, New York. Por exemplo, se os clientes pretendiam entidades para abertura de contas ou para negócios (transacção de imobiliário, fornecedores) propunha a constituição de entidades numa ou noutra jurisdição.......

........ Explicou que os clientes da Gestar eram bancos, os bancos é que apresentavam os clientes, os gestores bancários é que apresentavam as pessoas.........................................

........ Os clientes mais importantes da GESTAR eram os bancos do grupo Espirito Santos, mas também o Crédit Suisse, Crédit General, Banco Pictet ...Esse facto deve-se à ligação que Michel Joseph Ostertag tinha com o Grupo Espirito Santo uma vez que anteriormente trabalho no BPES.....................................................................................................................

........ Michel Joseph Ostertag saiu do grupo Espirito Santo e criou a empresa Gestar. Michel Joseph Ostertag trabalhou numa empresa fiduciária inglesa e isso deu-lhe *know how* necessário para criar a sua própria empresa...........................................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE INVESTIGAÇÃO E AÇÃO PENAL

........ Perguntado qual a sua ligação ao Grupo Espirito Santo? Esclareceu que a ligação que criou foi exclusivamente profissional e por via da actividade da Gestar. Reitera que quando começou na Gestar desconhecia completamente o tipo de actividade desenvolvido por esta empresa, a sua aprendizagem começou do zero. .........................................................

Sendo-lhe pedido para explicar em que consiste a actividade fiduciária, responde que se prende essencialmente com a detenção de fundos, bens e cujo objectivo prendia-se essencialmente para solucionar questões de organização sucessória (planeamento familiar) – ex. da criança deficiente, filhos deserdados – toxicodependentes – protegendo o património familiar. .............

........ Refere que se deram alterações no sistema bancário suíço. Em termos regulamentares havia regras de sigilo bancário e de sigilo profissional que incidiam sobre as estruturas por si criadas. Quando começou a sua actividade, em 2006, a abertura de contas bancárias era dificílima e a constituição de entidades também.............................................................

........ Explicou que, em 2012, a GESTAR fundiu-se com a EUROFIN SERVICES. Todos os empregados da Gestar, incluindo o próprio, passaram para a Eurofin. Em Abril de 2014 abandonou a Eurofin Services, rescindiu o seu contrato de trabalho.................................

........ Em 2009, Michel Joseph Ostertag criou no Dubai uma estrutura, com o mesmo tipo de actividade, tendo colaborado com esta entidade, era uma colaboração informal, embora nesta altura não efectuasse deslocações ao Dubai. .........................................................

........ Após a falência do Grupo Espirito Santo, em 2014, o Michel Joseph Ostertag convidou-o para assumir essa estrutura no Dubai, passando a ter uma presença formal nesta estrutura conjuntamente com ele. Actualmente essa entidade está adormecida por falta de pagamento dos clientes, devido aos bloqueios a que muitos destes clientes têm sido sujeitos. Acrescenta que entretanto fundou no Dubai uma entidade só sua, com a qual actualmente trabalha. .........

........ Esclarece que a sua actividade mudou consideravelmente devido às alterações legais, a sua actividade presente é local – Dubai – onde ajuda a obter registos e licenças de residência e de negócio........................................................................................................

........ Porque lhe é perguntado, explica que o nome da estrutura que mencionou acima é a ICG e os bancos onde os clientes tinham conta eram essencialmente ESBD, SFE Madeira e BPES. Os clientes eram do mundo inteiro, excepto norte americanos. Explica que é muito difícil abrir uma conta bancária a um norte-americano na Europa, a burocracia é muito grande e não é compensatória. Essa é a razão para não ter clientes americanos, mas tinham clientes do mundo inteiro. ...........................................................................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

....... Quando o grupo Espirito Santo faliu, as contas foram bloqueadas e os clientes deixaram de pagar. Muitos deles faliram e apresentaram-se às massas falidas..................................

....... Respondendo a pergunta feita, esclarece que a sua empresa actual chama-se ADV Management SA. ..........................................................................................

....... Perguntado se no âmbito da Gestar e ICG, lidava com clientes físicos ou só com bancos, responde que os gestores bancários traziam clientes, havia sempre uma introdução inicial por parte do gestor bancário, presencialmente ou após contacto telefónico, por email. ..................

....... Perguntado quem eram os gestores bancários com quem mais trabalhava, esclarece que trabalhava com dezenas, só consegue precisar em concreto se lhe indicarem a geografia sobre a qual pretendem informação. .....................................................................................

....... Começando pela Suíça, esclarece que o BPES e SFE Madeira estavam presentes onde quer que estivesse a diáspora portuguesa. No que diz respeito ao ESBD a situação era mais específica porque nessa área geográfica não há uma presença portuguesa significativa. ........

....... Perguntado quais os gestores dos seus melhores clientes venezuelanos, esclarece que o director geral da SFE, João Alexandre Silva – que lhe foi apresentado por Michel Joseph Ostertag e Humberto Coelho, comercial do ESBD. Acrescenta que Michel Joseph Ostertag lhe apresentou João Alexandre Silva porque seria o inquirido a deslocar-se à Venezuela para recolher a documentação das contas que seriam abertas no ESBD. .................................

....... Esclarece que João Alexandre Silva é que se encontrava mandatado pela direcção do BES para desenvolver os negócios na Venezuela e tentar, como conseguiu, licença bancária para o BES abrir sucursal em Caracas e, simultaneamente, captar fundos estatais venezuelanos para o BES. Antes desta data, 2009, nada tem a ver com a Venezuela. .............................

....... Acrescenta que, por outro lado, havia a necessidade de desenvolver o negócio da área private (clientes particulares) razão pela qual foi designado para acompanhar essa parte do negócio, sendo indicado pelo seu patrão, Michel Joseph Ostertag. A presença de Humberto Coelho deve-se ao facto das contas serem abertas no ESBD, onde aquele trabalhava. ...........

....... Os clientes não queriam contas em nome pessoal – por isso se criaram estruturas - e foram as mesmas abertas no ESB Dubai por indicação do Grupo Espirito Santo. ...................

....... Neste contexto, a Gestar pedia a advogados a constituição e incorporação de entidades/sociedades, após o depoente obter a documentação dos clientes privados, encarregava-se de enviar a documentação para o ESBD para que as contas fossem abertas. ..

....... Perguntado se as contas estavam no BES Venezuela, responde que não, só no Dubai...

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

Esclarece que, a dado momento, o grupo Espirito Santo decidiu que as contas dos clientes venezuelanos deveriam ser transferidas para outras entidades bancárias do grupo, sendo as entidades divididas pelo João Alexandre Silva entre o BPES e a SFE Madeira. ....................

........ O critério desconhece qual foi, apenas lhe foi comunicado por João Alexandre Silva a necessidade da transferência das contas do ESBD para o BPES ou SFE. ............................

........ Houve, portanto, necessidade de recolher novamente documentação para efectivar essas transferências de contas. Qual a razão? Desconhece. Não sabe responder, fez perguntas sobre este assunto mas todas as respostas que obteve foram evasivas. Na sua opinião tal ficou a dever-se a razões comerciais. Recentemente tomou conhecimento, até porque foi público, que houve algum desconforto por parte das autoridades do Dubai em manter contas de venezuelanos naquela jurisdição. ...............................................................................................

........ Regressando a João Alexandre Silva, esclarece que o ex-Director geral da SFE BES, era um excelente comercial. Tinha contactos privilegiados em vários locais do mundo. Terá sido a administração do BES que lhe terá indicado a necessidade de desenvolver os negócios do BES naquela região. Isto deve-se igualmente, e vem na sequência da oportunidade criada pelas visitas de estado a Caracas do então primeiro-ministro português, José Sócrates. ..................

........ João Alexandre Silva terá sido introduzido, nestas circunstâncias e contexto, às cúpulas políticas venezuelanas. Isto também se devia à necessidade dos venezuelanos terem acesso a cartas de crédito, linhas de crédito, com garantias dadas pela PDVSA, para aquisição de diversos produtos básicos (alimentares, medicamentos, ...). Obviamente isto geraria avultados proveitos para o BES. De igual modo, ao que saiba, a Venezuela não atribuía uma licença bancária a uma entidade estrangeira há cerca de 15 anos, facto que se veio a alterar com a licença concedida ao BES. Crê que o João Alexandre Silva trabalhou no BES cerca de 30 anos.

........ Mais explicou que a PDVSA era a "*mãe*" de todas as companhias estatais, que viviam do lucro que esta entidade gerava, incluindo empresas de outros sectores de negócio – eléctrico, construção de vivendas .... – tudo se encontrava dependente da actividade da PDVSA. .........

........ A pergunta colocada, explica que nunca trabalhou com empresas estatais venezuelanas, apenas conheceu indivíduos privados apresentados por gestores bancários da SFE. ............

........ Perguntado se conhece Abraham Shiera, responde que não, conhece apenas das notícias. Após a sua intervenção com o processo português, teve a curiosidade de ir ver quem estas pessoas eram. ...........................................................................................................

........ Perguntado se alguma vez se correspondeu com ele, responde que não. ....................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt

53





MW

........ Às 11H35 é efectuada uma interrupção sendo retomada a diligência às 11H50.............

........ Continua a responder que os clientes com que contactou eram, do seu ponto de vista, pessoas íntegras e respeitáveis, se, após ou mesmo antes de lhe serem apresentados, começaram a desenvolver actividades ilícitas não pode responder sobre isso. ....................

........ Todos os fundos de que tem conhecimento vieram do grupo Espirito Santo, a origem do dinheiro dos clientes venezuelanos é ao que saiba Espirito Santo. Todo o dinheiro que entrou nas contas dos venezuelanos teve origem no próprio Espirito Santo. Desconhece qual a origem dos fundos do BES.A sua relação com estes clientes venezuelanos deve-se a comissões pagas pelo BES a estes senhores, uma vez que eram geradores de negócio para o GBES, e isto é público. .......................................................................................................

........ Explica que este dinheiro era lucro oriundo do negócio gerado pelo BES, a propósito de cartas de crédito, depósitos ... parte destes lucros eram pagos, como comissões, aos venezuelanos que angariavam estes negócios. Por exemplo: a PDVSA investia no BES, esses investimentos geravam lucros, parte desse lucro era distribuído a clientes seus – segundo um critério definido pelo BES – o dinheiro vinha do próprio BES. ...........................................

........ Sendo-lhe perguntado quem mandava efectuar esses pagamentos, afirma o que está nos jornais, tanto quanto sabe era uma decisão da administração do BES. ...............................

........ Perguntado como sabe que o dinheiro do BES efectivamente chegava às contas dos seus clientes, esclarece que era informado pelo Michel Joseph Ostertag, que tinha acesso aos extractos das contas. ...................................................................................................

........ Pedem-lhe para explicar o fluxo do dinheiro, esclarece por exemplo que a PDVSA (podia ser outra empresa pública) mas a título exemplificativo menciona a PDVSA: o dinheiro vinha da Venezuela, era investido em produtos financeiros BES, isso geraria lucro, e esse lucro era dividido – de acordo com um critério que desconhece. ...................................................

........ Perguntado se esses pagamentos se encontram reflectidos na contabilidade do BES, afirma desconhecer. Nunca trabalhou no banco. ..........................................................

........ Perguntado se se recorda de alguém que tenha recebido muito dinheiro nas contas do ESBD, afirma não se recorda, a sua vida continuou e não ficou a pensar no que se passou há anos atrás. ..................................................................................................

........ A pergunta se conhece Nervis Villalobos, responde que não é seu cliente..................

........ A pergunta se conhece Abraham Shiera, responde que não é seu cliente....................

........ A pergunta se conhece Roberto Rincon, responde que não se recorda.......................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt

54



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

........ A pergunta se conhece Javier Alvarado, responde que não é seu cliente. ....................

........ A pergunta se conhece Rafael Ramirez, responde que conhece já que se trata de uma figura pública. ....................................................................................................

........ A pergunta se conhece Rafael Reiter, responde que não conhece. ............................

........ De seguida, foram-lhe exibidos vários documentos cuja cópia se junta ao auto e que são descritos como Doc seguido de um número que se encontra aposto nos mesmos:...................

**Doc.1** – responde que a senhora é secretária de uma pessoa que quis ser seu cliente mas que não foi seu cliente.........................................................................................................

**Doc.2** – Não sabe quem é Gemini, reconhece o seu endereço de email mas não sabe quem é a entidade Gemini...........................................................................................................

**Doc.3** – Acha que é um organigrama de algo que tentaram fazer mas nunca foi feito. Não sabe quem Gemini é. ..........................................................................................................

Perguntado qual é a intenção, proposta desta estrutura, esclarece que fez centenas destes diagramas. Não recorda qual o negócio que está subjacente a este diagrama. .....................

Sendo novamente exibido o **Doc. 1** – afirma não se lembrar ao que isto diz respeito. Recorda agora que esta senhora, Ana, era o braço direito de uns empresários venezuelanos com quem nunca fez negócio. Vendo o documento recorda Abraham Shiera, mas afirma que ele nunca foi seu cliente. ..........................................................................................................

........ Recorda que houve uma tentativa para estruturar um negócio mas que morreu à partida, foram pagos honorários (porque a sua entidade teve custos) mas nada foi feito. ..................

........ Pode ter sugerido nomes de entidades mas nunca abriu qualquer conta, nunca entraram ou saíram fundos. ...................................................................................................

........ Recorda-se que houve a intenção de fazer alguma coisa com Abraham Shiera, desconhece completamente que negócios estão subjacentes. ..........................................

........ Explicando o diagrama que consta no documento que ora lhe é exibido: deveria haver uma aquisição de acções num banco, que desconhece completamente qual seja, e depois estes fundos deveriam ser divididos por três amigos. Não recorda quem eram os "*amigos*". Não se recorda deste email, pode dizer que os detentores formais destas empresas não são estes senhores. Os seus clientes são os accionistas, sócios formais destas sociedades, tudo o resto são acordos em relação aos quais desconhece em absoluto e não são os que vêm mencionados neste email. ........................................................................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

........ Estas sociedades são detidas por outras pessoas, não se recordo do nome das pessoas, mas sabe que não são estes. Pode identificar mais tarde o nome das pessoas que detêm formalmente estas companhias, mas, de todo o modo, sabe que os bancos têm obrigatoriamente que ter estas informações. ........................................................................

........ Afirma taxativamente que os seus clientes não faziam parte do governo, assumindo evidentemente que as informações que lhe forneceram eram correctas. ................................

........ Nunca teve nenhuma conversa com o Abraham Shiera sobre o pagamento de subornos a altos quadros da Venezuela. ..............................................................................................

........ Pergunta se é possível que sejam seus clientes familiares das pessoas que figuram formalmente na conta, responde que na altura não tinha conhecimento desse facto. Não tinha conhecimento das actividades dos seus clientes.Se alguma vez considerasse que a sua actuação poderia estar, de algum modo, envolvida com algo ilícito, ter-se-ia afastado imediatamente. ...............................................................................................................

........ De volta ao diagrama, e perguntado qual o objectivo de distribuir esse dinheiro, afirma que desconhece totalmente o propósito destes diagramas. Mais acrescenta que, qualquer fluxo de fundos para qualquer espécie de estrutura, estariam sempre suportados por contratos justificativos, de outro modo nada passaria pelos *compliances* de qualquer entidade bancária. ...

........ Questionado se os contratos que menciona poderiam ser falsos, responde que não tinha qualquer hipótese de saber se os contratos subjacentes são ou não forjados. Mais afirma que os contratos não são importantes para si, não lhe interessam para nada, os contratos são solicitados pelos bancos. ..........................................................................................................

........ Por exemplo o BES? Responde afirmativamente. Os clientes que sabiam que iam receber fundos, tinham que ter um contrato justificativo da entrada dos fundos, sendo tal contrato solicitado pelos bancos, é uma exigência dos bancos. ...................................................

........ Não precisava dos contratos, não tinha qualquer intervenção nos mesmos, não intervinha, não os lia, só os transmitia aos bancos. ........................................................................

**Doc. 4** – Esclarece que a assinatura ali mencionada é a dos directores do Panamá, não o próprio. Refere que ali se encontram dois formulários de contratos fiduciários. Há aparentemente uma detenção fiduciária. Está assinada pelo cliente mas não pela empresa do Michel Joseph Ostertag. Isto pode estar ligado a coisas que se tentaram fazer mas não foram concluídas. .....

........ Perguntado sobre quem escreveu estes contratos, responde que alguém da estrutura de Michel Joseph Ostertag, são contratos standard. .........................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL



........ Eram contratos fiduciários, sobre os quais eram cobradas comissões, cobrados aos clientes para deterem os bens do cliente. A lei Suíça na altura previa a cobrança mínima de 0.20% de comissão, nestes casos concretos a comissão era de 0.5%. Não tem a certeza se estes dois contratos foram ou não concretizados. ..........................................................

........ Perguntado se sabe para quem mandou este email, responde que não. ........................

**Doc. 5** – Tem uma vaga ideia sobre o mesmo. O seu contacto com Shiera era através desta senhora, reitera que por falta de documentação nunca chegaram a concluir a constituição desta estrutura. ..............................................................................................................

Sendo-lhe perguntado quem são os "*nuestros amigos*". Afirma que não recorda. É corrente, na sua actividade, por questões de segurança e sigilo, usarem expressões deste tipo. Aliás, nem era habitual os clientes falarem directamente com eles, era frequente terem alguém a tratar das coisas por eles. ..............................................................................................

**Doc. 6** – Afirma que aparentemente terà havido uma conta aberta. Está naquele caso a remeter os meios para o cliente remotamente aceder à conta. ...................................................

Perguntado quem é "*Rafa*", afirma que recorda de um Rafael, mas Rafael é um nome comum. Sendo questionado sobre o cliente formal esclarece que se trata de Samark Lopez, esse sim era seu cliente. ..............................................................................................................

........ Explica que este email demonstra que o Rafael Reiter tinha acesso à conta de Samark Bello. Era muito possível que tivesse acesso à conta e isto era uma situação muito comum. Não era estranho que as pessoas concedessem acesso às suas contas a amigos ou outras pessoas, isso sucedia e não o questionava. Pormenoriza que este acesso não era para operar a conta, era apenas para visualizar. Do seu ponto de vista isso pode dever-se a cautelas do ponto de vista sucessório. ..............................................................................................................

........ É-lhe referido que, tal como sucedeu com o Samark e Reiter, estas situações sucederam com outras pessoas. Afirma que, se for confrontado com mais nomes, pode ser que se recorde.

........ Sendo questionado sobre Nervis, Alvarado, Milagros se algum deles tinha uma situação semelhante à descrita acima, de acesso à conta, com possibilidade de visualizar a conta, responde que não se recorda, só se recordou da situação acima descrita por lhe terem sido exibidos os documentos. Não tem nenhum arquivo pessoal, ficou tudo nos servidores da Eurofin (entidade para a qual migraram as informações após a fusão da Gestar). ..........................

........ Foi feita uma pausa para almoço entre as 13H15 e as 14H30, sendo a diligência retomada a essa hora. ..............................................................................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt





........ Regressando à questão da empresa ICG, explica que há várias empresas ICG. A primeira foi fundada por Michel Joseph Ostertag, no DIFC do Dubai, antes de 2009, não sabe exactamente a data, uma zona off shore do Dubai. Foi ali criada para apoiar os clientes do ESBD que se encontravam ali sedeados. Essa ICG foi a que foi liquidada 4 anos depois. Houve depois outra ICG, igualmente fundada por Michel Joseph Ostertag, no DMCC, criada em 2011/2012, esta foi a entidade para a qual passou a prestar serviços, e foi esta que, em final de 2014, integrou como sócio. ........................................................................................

........ Entre 2008 e 2012/2013, Michel Joseph Ostertag criou outras ICG, nomeadamente no Panamá. Estas seriam as ICG usadas para cobrar aos clientes os honorários. Por exemplo, era criada uma sociedade a um cliente venezuelano, todos os custos destes serviços eram cobrados por esta ICG do Panamá. No Panamá foram criadas várias ICG. .......................................

........ As empresas ICG do Dubai (DIFC e DMCC) nunca tiveram clientes da Venezuela. Só a ICG do Panamá é que teve clientes da Venezuela, tudo era cobrado por esta entidade panamiana. ......................................................................................................................

Perguntado que outras ICG houve, esclarece que havia a ICG Directors, a ICG Nominees. Eram entidades que prestavam serviços aos clientes, por exemplo, um cliente não queria ser director da sua estrutura, contratava a ICG Director, ou um cliente que não queria que as acções da sociedade constituída ficassem directamente em seu nome, então contratavam a Nomenee Share Holder. .................................................................................................................

........ Apesar de ser uma prática comum, o facto dos clientes não querem que os seus nomes figurassem nas sociedades, na prática os bancos tinham obrigatoriamente de ter conhecimento dos beneficiários económicos últimos das estruturas. Portanto os bancos saberiam sempre. ......

........ Salvo se houvesse um acordo em que terceiros poderiam ter acesso de visualização das contas? Responde que não tinha que saber isso, se o cliente decidisse facultar as suas *passwords* a alguém, isso era algo que desconheceria completamente. Ao contrário do exemplo que lhe mostraram na documentação exibida, nesse caso a comunicação passou por si mas não tinha que ser assim, e poderia ter havido comunicação sem o seu conhecimento. ...................

........ A quem é que as ordens dos clientes eram transmitidas? Responde que aos gestores das contas, no caso do ESBD o gestor era Humberto Coelho. No caso do BPES aí eram vários gestores, havia uma Verena Sframel e não se recorda de mais, se se recordar entretanto informa. ......................................................................................................................



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt





........ Perguntado quem o apresentou Shiera, responde que João Alexandre Silva. Todos os clientes venezuelanos foram-lhe apresentados por João Alexandre Silva. ............................

........ A pergunta feita, recorda-se de ter tido reuniões em Caracas juntamente com Shiera e João Alexandre Silva. ..........................................................................................................

........ Sendo-lhe pedido para descrever o que ocorreu e o que foi discutido nessas reuniões, explica que discutia questões comerciais. ..........................................................................

........ João Alexandre Silva introduzia os clientes, informava o que os clientes pretendiam, explicava como se processavam os procedimentos bancários. Reitera que nunca teve presente em negociações relativas aos negócios dos clientes propriamente ditas, quando chegava às reuniões o João Alexandre Silva já sabia exactamente o que os clientes pretendiam, qual o teor do negócio em causa, por exemplo, qual o país para o qual se destinava por exemplo uma exportação..... O seu papel era meramente operativo na perspectiva de implementar o que os clientes pretendiam. ..................................................................................................

........ Explica que o João Alexandre Silva é que lhe dava as indicações concretas do que os clientes pretendiam. Dada a sua experiência profissional, era fácil por exemplo indicar qual a jurisdição mais adequada para a finalidade pretendida (por exemplo: se para *trading* indicaria Malta, se para detenção de imobiliário indicaria Delaware, se para mera abertura de conta indicaria uma estrutura do Panamá...) .........................................................................

........ Quantas vezes se recorda de reunir com Abraham Shiera? Recorda-se se reunir 2 vezes com ele. Mas habitualmente falava mais com a Sr.ª Ana Torre, que entretanto recordou-se tratar-se da directora financeira de empresas detidas por Shiera. ........................................

........ João Alexandre Silva estava sempre presente nestas reuniões, esta Ana Torre esteve presente numa das reuniões mas a maioria dos contactos eram por email, telefónico.............

........ Esteve uma vez com João Alexandre Silva, Abraham Shiera e um terceiro indivíduo chamado Roberto. Nunca fez negócio com este Roberto mas numa ocasião estiveram juntos...

........ Recorda-se agora de que havia dois Robertos. Um mais velho e um mais novo, pensa que pai e filho. Essa reunião deu-se em Caracas, no Hotel Eurobuilding, e estavam presentes pai e filho, Robertos, Shiera e João Alexandre Silva além do ora depoente. Quando chegou à reunião já o assunto estava perfeitamente definido. Na sua perspectiva era mais uma situação de mera abertura de conta bancária. Do que se recorda, em princípio, a definição das estruturas já estava mais ou menos pensada e anteriormente conversada. A sua intervenção, tal como explicou atrás, limitava-se a operacionalizar as questões. Propunha algumas alterações para

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE INVESTIGAÇÃO E AÇÃO PENAL

melhor adequar aos propósitos que lhe diziam pretender alcançar, sugerindo algumas alterações. ........................................................................................................................

........ Quanto a estas reuniões, responde que uma delas ocorreu na Suite do Shiera num hotel, outra num restaurante. Responde que foram reuniões formais, de trabalho. ..........................

........ Perguntado se alguma vez se reuniu com Nervis Villalobos em Caracas, responde que esse senhor não era seu cliente mas eu vi-o uma vez com João Alexandre Silva no hotel, ao pequeno almoço. Era habitual haver reuniões ao pequeno-almoço nos hotéis. Os gestores do BES reuniam muitas vezes com clientes logo ao pequeno-almoço nos hotéis. Foi nessa circunstância e contexto que se recorda de ver Nervis Villalobos. ......................................

Recorda-se da conversa mantida? Responde que não foi discutido nada, foi apenas apresentado. A conversação que houve foi mantida com João Alexandre Silva. Não acompanhou esta reunião. Esclarece que a apresentação foi de mera cortesia. ....................

........ Perguntado se os clientes venezuelanos eram um segmento relevante para si, responde que eram cerca de 60 clientes dum total de 2000 clientes, portanto não eram um número significativo na carteira.........................................................................................................

........ E em termos de volume de negócio? Obviamente que eram clientes importantes, mas era muito mais importante manter o parceiro estratégico que era o Grupo Espirito Santo, com implementação no mundo inteiro. O primeiro ano não foi rentável, dado o custo das viagens, obviamente depois passou a ser rentável mas o interesse principal e o que o Michel Joseph Ostertag pretendia era manter a proximidade com o cliente estratégico BES. ........................

........ Voltando às estruturas montadas, exibido novamente o **Doc.3** perguntado se essa estrutura foi montada por si ou por João Alexandre Silva, responde que não se recorda especificamente desta realidade. Contudo acrescenta que essa estrutura não tem nada de extraordinário, é uma coisa do mais simples que existe. É uma coisa básica, para dizer que alguém iria receber fundos e iria haver uma distribuição de fundos. "*AB*" seria Abraham, "*Rob*" seria Roberto, agora os amigos não sabe quem seriam. Percebe que seria para tomar uma posição num banco mas desconhece qual. Isto terá sido discutida na reunião que ocorreu no Eurobuilding em Caracas. Acrescenta ainda que nada disto foi implementado, porque o Roberto nunca foi seu cliente. Isto só pode ter sido feito nessa reunião porque foi a única ocasião em que se recorda em que esteve presente. ..............................................................................

........ Perguntado se sabe quem são estes três "amigos", responde que não. .......................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt







........ Sendo pedido para comentar o facto de Abraham Shiera afirmar que o ora inquirido sabe quem são os "*amigos*", afirma que se ele disse isso provavelmente é verdade, mas que se recorde não sabe quem são. Afirma que João Alexandre Silva é que poderá ajudar nesta matéria. O João Alexandre Silva é que conversava com estas pessoas, ele é que poderá ajudar. Se tivesse tido intervenção teria que ter constituído as sociedades porque não se limitava a abrir contas bancárias, isso quem fazia era o cliente ou o João Alexandre Silva que era gestor bancário. ......................................................................................................

........ Sendo-lhe explicado que o que se pretende é saber quem são "*os amigos*", quem são os destinatários finais destas transferências, os que receberam este concreto pagamento através da entidade European Sovereign Investments & Managment Company, afirma compreender essa pretensão, afirmando que eventualmente esta transferência terá sido efectuada através da conta bancária que a European Sovereign Investments & Managment Company detinha no ESBD. Acrescenta que não tinha autoridade para efectuar este tipo de movimentações, o Michel Joseph Ostertag é que tinha esse poder. Tudo teria que ser tratado directamente com João Alexandre Silva, ele, como disse anteriormente, é que tratava directamente com os clientes.

........ Mais quer acrescentar que isto era para si uma questão trivial, sem a importância suficiente para recordar 5 ou 8 anos mais tarde. ........................................................

........ Perguntado se alguma vez reuniu pessoalmente com Rafael Reiter ou falou com ele, esclarece que não sabe se esteve ou não. A esta distância não se consegue recordar. .............

........ Perguntado se conhece Eudomario Carruyo, responde que sim. É alguém que apareceu com João Alexandre Silva, para abrir conta para uma senhora. ..........................................

........ Perguntado se se trataria da sua esposa, Responde que não. Foi-lhe apresentada como sobrinha. ........................................................................................................

........ Perguntado se sabe qual era a posição profissional de Carruyo, afirma que era aposentado. Era já um senhor de idade e ficou com a ideia que era um senhor reformado. ........

........ Perguntado se a sobrinha era sua cliente, responde que sim, ela ficou sua cliente. ........

........ Sendo informado que Eudomario Carruyo foi, até 2012 CFO da PDVSA, é-lhe perguntado se se recorda de algum outro exemplo semelhante a esta, responde que não. .......................

**Doc. 7** – questionado se reconhece a assinatura que consta no contrato, afirma desconhecer essa assinatura, não é sua nem do Michel Joseph Ostertag. Questionado sobre o contrato que remeteu a Ana, afirma desconhecer completamente a assinatura, admite ter remetido o contrato

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

mas desconhece a assinatura. Esta empresa é do Michel Joseph Ostertag e só ele poderá esclarecer quem é que a representava, quem podia ou não assinar. ..................................

Recorda-se da criação da empresa European Sovergny? Responde que não. ........................

É feita uma pausa às 15H45 sendo a diligência retomada às 16H00. ....................................

........ Perguntado se conhece a sociedade Eurasian? Responde que sim, foi constituída em Macau, por Michel Joseph Ostertag e Ricardo Carvalho com o propósito de investir em GES. Com o afastamento de Michel Joseph Ostertag, em 2016, tal como fez com a outra parte do negócio, Michel Joseph Ostertag entendeu passar parte das acções da Eurasian para si, situação que se mantem até à presente data. É uma situação que só gera custos. Não tem activos nem saldos bancários. É uma empresa constituída em Macau e, se tiver oportunidade, voltará a reactivá-la. ..........................................................................................................

........ Os beneficiários finais da Eurasian foram inicialmente Michel Joseph Ostertag e Ricardo Carvalho e, após 2016, Michel Joseph Ostertag e o próprio. ..............................................

........ Perguntado se Nervis Villlobos tem algo a ver com a Eurasian, responde que não, nada.

........ Exibido o **Doc. 8**, afirma que não compreende o que aqui está. Que saiba o que esta sociedade fazia era adquirir participações no Grupo Espirito Santo. Constará nesta correspondência electrónica em virtude de ser o contacto comercial com os clientes venezuelanos. Não tem mais a acrescentar. ...............................................................

........ Porque motivo fornece a informação bancária desta entidade Eurasian? É possível que a tenha dado uma vez que era o operativo destas situações, recebia e transmitia informação. Não se recorda desta situação em concreto.........................................................................

Sendo questionado se terá reencaminhado esta comunicação por indicação de Michel Joseph Ostertag, não consegue responder. ...........................................................................

........ Sabe se esta conta recebeu subornos? Sabe apenas que esta conta foi criada para investimentos em Espirito Santo, sabe que o negócio do GES passou por captação de fundos na Venezuela. Se um milionário venezuelano entendesse efectuar investimentos em Espirito Santo, e caso não intencionasse adquirir em nome próprio, isso seria possível de concretizar através de entidades como a Eurasian. Estas negociações eram feitas pelo João Alexandre Silva ou pelo GES directamente, o Dr. Ricardo Salgado, para captarem investimentos em GES, e poderiam utilizar esta estrutura fiduciária para operacionalizar esses investimentos. ............................

........ Sabe de onde vieram os fundos colocados na Eurasian? Dado o email que foi exibido, admite que a origem dos fundos seja a que aí consta. ...................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE INVESTIGAÇÃO E AÇÃO PENAL

........ A pergunta feita, explica que teve inúmeras conversas com o Michel Joseph Ostertag sobre Eurasian, não consegue precisar o conteúdo das mesmas. Responde igualmente que nunca teve conversações sobre esse assunto com o Nervis, sobre isso terão que questionar João Alexandre Silva ou Michel Joseph Ostertag. ............................................................

........ Sendo questionado se esta entidade - Eurasian – tivesse recebido subornos, quem é que poderia esclarecer esta questão, diz não saber e teria que ser muito ingénuo para assumir, em 2016, parte de uma entidade envolvida em negócios escusos. A sua convicção era de que se tratava de uma empresa fiduciária, desenvolvida para efectuar investimentos no GES. ..........

....... Perguntado se João Alexandre Silva teve algum papel activo na constituição da Eurasian, afirma que sabe que antes da constituição da Eurasian houve uma série de pessoas do GES que, conjuntamente com Michel Joseph Ostertag, foram a Macau e organizaram a criação da Eurasian. Sabe que todos esses investimentos em Espirito Santo seriam necessariamente sempre previamente validados pela administração do BES e GES. Sabe disto por ter presenciado conversas mantidas com Michel Joseph Ostertag e João Alexandre Silva, é evidente que não existiriam investimentos em ESFG ou Rio Forte sem a aprovação. ............

........ Quem são os administradores de que está a falar? Esclarece que o Grupo Espirito Santo são vários ramos familiares, um é liderado por Ricardo Salgado, outro liderado por José Manuel Espirito Santo, outro por Manuel Fernando Espirito Santo, o quarto pelo Comandante Ricciardi e finalmente, o último, por Mosqueira do Amaral. ....................................................

........ Quem estava mais directamente ligado à execução executivo do Grupo era o Ricarod Salgado. O João Alexandre Silva era o braço direito de Ricardo Salgado para os negócios na Venezuela, aí era evidente, noutros sítio também admite que sim.

........ Perguntado se João Alexandre Silva era muito importante para o GES? Responde que sim, muito. Até há muito pouco tempo, segundo soube ele continuava a ser o maior angariador de fundos para o Novo Banco. ................................................................................

........ A Eurofin Capital também era um grupo de investimentos substancialmente direccionados para o GES. Para captar fundos para o GES. ........................................................

........ Perguntado no que diz respeito à Eurasian, quem é que efectuou a negociação de investimento em GES? Quem propôs a Nervis e Rincon? Responde que João Alexandre Silva.

**Doc. 9** – São as coordenadas da conta bancária da Eurasian. Terá recebido a indicação para envio destas coordenadas muito provavelmente de Michel Joseph Ostertag. Mas isto constava de uma base de dados. ...............................................................................

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt



MINISTÉRIO PÚBLICO
PORTUGAL

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE
INVESTIGAÇÃO E AÇÃO PENAL

**Doc.10** – Loan Agreement da entidade Austrey. Não sabe nada sobre este Loan Agreement. Estes nomes não lhe são familiares, não recorda. Não recorda minimamente a situação, não consegue esclarecer. ...................................................................................................

**Doc. 11** – Omar Labarca? Não recorda. Não consegue esclarecer nada. ...........................

........ Perguntado se sabe quem era César Rincon, responde que não. .............................

........ Perguntado se conhece a entidade Morofield, afirma que era uma companhia incorporada pela sua empresa, mas não sabe indicar quem era o beneficiário. Sendo confrontado com o facto de ter conhecimento que a Morofield era efectivamente para César, afirma que para si – à data – desconhecia completamente quem era César Rincon, na altura seriam muito recomendados. ...................................................................................................

........ Perguntado quem recomendou César? Não recorda minimamente, se abriu a conta a Labarca com certeza que o conheceu, mas o César não conheceu seguramente. ....................

........ Conheceu Cesar Rincon? No contexto que lhe foi exibido não. Admite ter conhecido Cesar Rincon mas não neste contexto. ...................................................................................

........ Perguntado se foi a Caracas para abrir a conta Morofield? Afirma que sim, terá ido seguramente a Caracas para abrir esta conta e terá contactado pessoalmente com Labarca. É importante confirmar que na altura fez todas as *due diligences* necessárias para que pudesse ser aberta uma conta bancária junto do grupo Espirito Santo. Se soubesse, naquela altura, as consequências que daí resultariam evidentemente que teria tido outros cuidados. À data o interesse era em angariar negócio e clientes observando obviamente todas as *due dilligences* a que estava obrigado e que cumpria escrupulosamente. Aconteceu por vezes o banco discordar e pedir mais informação, aconteceu algumas vezes as contas não serem abertas. Algumas vezes as contas estavam meses para ser abertas. O banco determinava os critérios para permitir a abertura de contas e eu limitava-se a cumprir esses critérios. ..............................

Perguntado se conhece Charles Beach? Não conhece. ....................................................

Perguntado se conhece Ernesto Guevara? Não conhece. ...............................................

Perguntado se conhece Yasmin Luengo? Não conhece, são nomes que não lhe dizem nada. ..

**Doc.12** – Sendo –lhe pedido para explicar porque representava o Eudomario Carruyo? Esclarece que foi pedido extraordinário efectuado pelo João Alexandre Silva, que era uma pessoa muito próxima deste Eudomario Carruyo. Como à data vivia na Suiça, o João Alexandre Silva pediu-lhe para que intercedesse junto da gestora da Eagle, uma congénere da sua

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt

64



**MINISTÉRIO PÚBLICO**
**PORTUGAL**

PROCURADORIA-GERAL DA REPÚBLICA
DEPARTAMENTO CENTRAL DE INVESTIGAÇÃO E AÇÃO PENAL

empresa, com sede em Zurique, para que desbloqueassem os fundos destes senhores, junto da Eagle Wealth Managment. Tal foi-lhe recusado e esse assunto morreu para si. ..................
Sabe porque Eudomario queria tirar o dinheiro da Suíça e não conseguia? Não, sabe explicar a razão de ser. ..........................................................................................................

--- E mais não disse. Lido ratifica e vai assinar.

--- Para constar se lavrou o presente auto, cuja diligência terminou pelas 18:50 h, que vai ser assinado.

Processado por computador



Rua Gomes Freire, 213 – 1150-178 Lisboa
Telef: 213 847 011 * Fax: 213 847 048 * Mail: correio.dciap@pgr.pt