United States District Court
Southern District of Texas
**ENTERED**
July 11, 2022
Nathan Ochsner, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| VS. | § | CRIMINAL NO. 4:17-CR-00514 |
| | § | |
| LUIS CARLOS DE LEON-PEREZ, *et al.*, | § | |
| | § | |
| Defendants. | § | |

## THE COURT'S OMNIBUS MEMORANDUM ADDRESSING THE DEFENDANT'S MOTION TO DISMISS

## I.   INTRODUCTION

Before the Court are the defendant's, Paulo Jorge Da Costa Casqueiro Murta ("Murta")[1], several motions to dismiss the Superseding Indictment ("SSI") as follows: (a) for lack of jurisdiction, for due process violations, and due to unconstitutional vagueness [DE 262]; (b) for violation of the Speedy Trial Act [DE 263]; (c) for violation of the statute of limitations [DE 267].  The defendant also filed a motion to suppress based on alleged violations of his *Miranda* rights under the Fifth Amendment to the federal Constitution. Before the Court, as well, are the government's respective responses, and any replies filed by the defendant [DEs 276, 278, 285, 290 and 293].  Although the defendant's motions are separately presented, the Court will address them in this Memorandum under Sections I, II and III.

---

[1] Throughout the Memorandum, the defendant, Paulo Jorge Da Costa Casqueiro Murta, will be referred to, alternatively, as "the defendant" and "Murta".

## II.     FACTS COMMON TO THE SSI DEFENDANTS[2]

### A.     *The SSI Factual Allegations*

According to the SSI, Petroleos de Venezuela, S.A. ("PDVSA"), is a Venezuelan state-owned/state-controlled oil company responsible for the exportation, production, refining, transportation, and trade of energy resources throughout the world in behalf of the Venezuelan government. PDVSA Services, Inc. ("PDVSA-S") is a United States based corporation, is a wholly-owned affiliate of PDVSA, yet located in Houston, Texas. PDVSA-S and Bariven, another wholly-owned subsidiary of PDVSA, are alleged to be "instrumentalities" [3] of PDVSA and responsible for purchasing equipment, soliciting vendors, and providing various services abroad associated with Venezuela's petroleum industry.

To award contracts for energy services, a PDVSA bidding panel issued requests for quotations to companies that, in turn, provide formal bids, from which a contractor was selected. All contract awards were ultimately approved by one or more senior PDVSA employees.

---

[2] With modest changes, the Court has repeated many of facts presented in Document Number 255 because this defendant's case arises out of the same nucleus of facts and is charged in the same indictment.

[3] The term "instrumentality" is not specifically defined in the relevant statutes, and the Fifth Circuit has not spoken on the matter.  The Eleventh Circuit has defined instrumentality as "an entity controlled by the government of a foreign country that performs a function the controlling government treats as its own." *United States v. Esquenazi*, 752 F.3d 912, 925 (11th Cir. 2014), cert. denied, 574 U.S.  876, 135 S.Ct. 293, 190 L.Ed.2d 141 (2014). It does not appear to the Court that a natural person can be deemed an instrumentality because the FCPA's definition of "foreign official" includes an "officer or employee of a [n] . . .  instrumentality [of a foreign government]." 15 U.S.C. § 78dd-1(f)(1)(A).

The SSI and related criminal information and indictments charge that individuals, Nervis Gerardo Villalobos Cardenas ("Villalobos"), Alejandro Isturiz Chiesa ("Isturiz"), Raphael Ernesto  Retter Munoz ("Munoz"), Cesar David Rincon Godby ("Rincon"), Luis Carlos De Leon Perez ("De Leon") and Javier Alvarado Ochoa ("Alvarado"), among others, were former employees of PDVSA, or one of its affiliates or agents,[4] who corruptly solicited  bids  and  participated  in selecting vendors for PDVSA in exchange for illegal kickbacks.  The vendors, in turn, received preferred treatment such that their invoices were preferentially paid.  At the time, the Venezuelan government was experiencing a liquidity crisis that began in 2010 because of, among other things, a decrease in PDVSA's  revenue, which had significant impact on Venezuela's budget. The Venezuelan government began to suffer as banks in the United States, and perhaps other countries, closed PDVSA's affiliate accounts.[5]

The  government  charges  that  PDVSA's  affiliates  and/or  agents  concealed  their illegal conduct.  In order for the defendants to do so, the proceeds derived from the kickback/bribery scheme by Rincon, Abraham Jose Shiera Bastidas ("Shiera"), De Leon, Isturiz,  Villalobos,  and  others  were  directed  to  bank  accounts  established  outside Venezuela and the United States.

---

[4] The term "agent" does not appear to be defined in either of the three sub-Sections of Title 15, Section 78dd.  Courts have held that the term's common law meaning is intended by Congress. *United States v. Hoskins,* 73 F.Supp. 3d 154, 165 (2d Cir. 2014) ("*Hoskins I*") (citations omitted). However, when the term is used to establish jurisdiction it becomes a question of law for the court.
[5] The evidence shows that on or about July 30, 2013, a civil suit was filed against Rincon, and perhaps others, that resulted in the seizure of certain funds by Swiss authorities and the closing of various accounts in Switzerland and the United States.  Whether these funds were returned to the Venezuelan government is of no consequence.

Concerning Murta, the SSI charges generally that he provided financial services in a manner that directly violated, or assisted others in violating, various United States federal statutes, in particular:  (a) Title 18 U.S.C. §§ 1956(h); (a)(1)(B) (i) and (a)(2)(A), the Money Laundering Control Act of 1986, as amended ("MLCA"), (b) Title 15 U.S.C. §§ 78dd -2(a) and -3(a), the Federal Corrupt Practices  Act ("FCPA"), (c) Title 18 U.S.C. § 371, conspiracy to violate the FCPA; and (d) Title 18 U.S.C. § 2, aiding and abetting.

To establish a jurisdictional basis to prosecute Murta, the SSI charges that he, although a citizen of Portugal and Switzerland, was an agent of Swiss Company B, various foreign co-defendants and one or more U.S.-based companies – "domestic concerns"[6] – and is a "person"[7] as that term is used in the FCPA, § 78dd-3(f)(1).  And, although the SSI does not charge that Murta was a BES[8] employee, it alleges that he worked closely with BES Banker 1 and Banker 2 to set up the structure and the accounts used to conduct financial transactions in the alleged money laundering scheme in "interstate commerce"[9]. In Section I, the Court addresses the defendant's motion concerning jurisdiction, failure to state a claim, due process and vagueness.

---

[6] The term "domestic concern" means (a) any individual who is a citizen, national, or resident of the United States, and (b) any corporation, partnership, or other business entity which has its principal place of business in the United States, or which is organized under the laws of a state of the United States or its territory, 15 U.S.C. § 78dd-2(h).

[7] Title 15 U.S.C. § 78dd-3 defines the term "person" as any natural person, other than a national of the United States (as defined in Section 1101 of Title 8) or any corporation.

[8] The acronym BES refers to Banco Espirito Santo S.A. of Portugal.

[9] The term "interstate commerce" includes, in relevant part, "trade, commerce, transportation, or communication . . . between any foreign country and any State . . . and . . . includes the intrastate use of— (A) a telephone or other interstate means of communication, or (B) any other interstate instrumentality." *Id.* § 78dd-3(f)(5).

## SECTION I.

## JURISDICTION, FAILURE TO STATE A CLAIM,
## DUE PROCESS AND VAGUENESS

In his first motion, the defendant seeks dismissal of all of the government's counts against him, asserting: lack of jurisdiction; failure to state a claim; violation of Fifth Amendment due process; and unconstitutional vagueness of the FCPA and MLCA. *See* DE 262. Part I of this Section, which follows, contains the SSI's factual allegations that are most relevant to the resolution of the defendant's motion.

## III.   MOST RELEVANT BACKGROUND FACTS

Counts 13 and 14 of the SSI charge that the defendant set up offshore bank accounts at BES for the benefit of Venezuelan officials, knowing that such would be used to receive bribe payments from the companies and accounts of Rincon and Shiera. These acts, contends the government, were acts of conspiracy violating the FCPA and the MLCA. In February 2012, the defendant allegedly traveled to Miami, Florida to meet with Shiera and his associate to discuss the alleged money laundering scheme. Between January 25, 2012, and March 18, 2013, the defendant, at Shiera's request, sent Shiera information relating to the opening of the BES accounts through email and text message.

The defendant also allegedly communicated with Rincon, Shiera, the PDVSA defendants, and their co-conspirators through email, phone, and text message regarding the BES accounts, the documentation necessary to "justify" the payments, and the structure of the wire transfers. In May 2012, the defendant allegedly emailed Shiera's associates an allegedly fake loan agreement that would be used to justify a $4.8 million wire transfer to

the officials' accounts.  The SSI does not state, however, that the defendant sent or received any of the alleged communications while in the United States.

As to Counts 18 and 19, the SSI alleges that, on March 25, 2013 and May 8, 2013, the defendant transferred, or aided and abetted others in transferring, funds totaling almost $8.5 million from Rincon Company 2 (a United States-based company) to Rincon Company 8 (a Venezuela-based company), with the intent of promoting the bribery of the Venezuelan officials.

## IV.    THE PARTIES' CONTENTIONS

### A.    The Defendant's Contentions

The defendant contends that the Court should dismiss Count 14 for lack of jurisdiction, asserting that the SSI does not sufficiently plead either that the defendant was an "agent" of a domestic concern under § 77dd-2(a), or that he was a "person" who committed criminal acts in the United States under § 77dd-3(a). Likewise, the defendant argues that Counts 18 and 19 should be dismissed for lack of jurisdiction, since the SSI alleges no facts to support that the defendant committed any part of a money laundering offense in the United States.

According to the defendant, Counts 13 and 14 should also be dismissed because (1) the government cannot extend the extraterritorial reach of the FCPA or the MCLA by charging conspiracy offenses and (2) the SSI's allegations as to his conduct in the United States do not state a charge for conspiracy.  The defendant further asserts that the government's prosecution of him violates his Fifth

Amendment "due process" rights and that the FCPA and MLCA are unconstitutionally vague as to his alleged conduct.

  B.  *The Government's Contentions*

  The government responds that, as to Count 14, the SSI sufficiently alleges criminal conduct by the defendant in the United States, both as an "agent" under § 77dd-2(a) and as a "person" under § 77dd-3(a).  Concerning the same count, the government contends that the SSI pleads a conspiracy charge against the defendant under general conspiracy principles.  As to Counts 18 and 19, the government argues that the defendant's alleged acts in the United States support substantive money laundering and aiding-and-abetting charges under the MLCA.  As well, the defendant's conduct in the United States subjects him to conspiracy liability under Count 13.  Finally, the government denies that its prosecution of the defendant violates due process, and that either the FCPA or the MLCA are unconstitutionally vague as to the defendant.

## V.  ANALYSIS & DISCUSSION

  A.  *Count 14—Conspiracy to Violate the FCPA (18 U.S.C. § 371)*

  The Court determines that Count 14 of the SSI should be dismissed based on lack of jurisdiction, lack of due process, and vagueness.  In Count 14 of the SSI, the government alleges that the defendant violated 18 U.S.C § 371 by conspiring with Rincon, Shiera, and others to violate the FCPA, specifically 15 U.S.C. §§ 77dd-(2)(a) and 77dd-(3)(a).  The government alleges that, under § 77-dd(2)(a), the defendant was an "agent" of Rincon, Shiera, and their United States-based companies.  To the extent the government alleges

"agency" based on the defendant's conduct abroad, the Court determines that it lacks extraterritorial jurisdiction over the defendant under § 77-dd(2)(a) and, therefore, under the conspiracy statute, as well.[10]   As an independent basis for dismissal, the Court reiterates its prior ruling that the term "agency" is constitutionally vague as to this foreign defendant. *See* DE 255, at 21–22.

Nor can the SSI support a conspiracy charge predicated on § 77dd-(3)(a), which must be based on the defendant's conduct in the United States.  A federal conspiracy charge requires evidence of "an overt act by one or more of the members of the conspiracy in furtherance of the objective of the conspiracy." *United States v. Nicholson*, 961 F.3d 328, 338 (5th Cir. 2020).   To satisfy this requirement, the government first relies on the defendant's alleged travel to Miami in 2012 to meet with Shiera's representatives regarding the alleged money laundering scheme.  That the defendant attended a meeting in the United States is, in the Court's judgment, insufficient to prove a conspiracy element beyond discussions or conversations. The government also cites as potential overt acts email communications between the defendant and other co-conspirators, dating from January 2012 to March 2013.  However, the SSI does not allege that the defendant either sent these

---

[10] The Court incorporates its reasoning set forth in the Court's prior memorandum opinion pertaining to defendant Daisy Rafoi-Bleuler. *See* DE 255, at 13–16.  None of the SSI's allegations establish that Rincon, Shiera, or any other "domestic concern" (*i.e.*, United States-based entity) had a "right to control" the defendant's actions. *Christiana Trust v. Riddle*, 911 F.3d 799, 803 (5th Cir. 2018).   Therefore, the government's allegations do not establish that the defendant was an "agent" to satisfy the jurisdictional requirements of the statute.  Nor can the government use the conspiracy statute to charge the defendant when his conduct is "not punishable under the FCPA itself because of the statute's territorial limitations." *United States v. Hoskins*, 902 F.3d 69, 97 (2nd Cir. 2018) ("*Hoskins II*").

communications from, or received them in, the United States.   Therefore, the communications are not overt acts that support a conspiracy to violate § 77dd-3(a).

Relatedly, neither the alleged Miami meeting, nor the defendant's email communications with co-conspirators establish a "sufficient nexus" between the defendant's alleged conduct and the United States to satisfy the due process requirement of the Fifth Amendment.  *See United States v. Lawrence*, 727 F.3d 386, 396 (5th Cir. 2013) (internal citations omitted).  For the foregoing reasons, Count 14 should be dismissed.

A.    *Count 18 and 19—Substantive Money Laundering Violations; Aiding and Abetting (18 U.S.C. §§ 1956(a)(2)(A) and 2); Count 13—Conspiracy to Commit Money Laundering (18 U.S.C. § 371)*

Counts 18, 19, and 13 should also be dismissed for lack of jurisdiction.

In Counts 18 and 19 of the SSI, the government asserts that, on March 25, 2013 and May 8, 2013, the defendant unlawfully transferred funds from Rincon Company 2 to Rincon Company 8, or aided and abetted such a transaction, in violation of 18 U.S.C. §§ 1956(a)(2)(A) and 2, respectively.  The Court determines that it lacks jurisdiction over Counts 18 and 19.

The MLCA confers extraterritorial jurisdiction over non-citizen defendants located outside the United States only "if the [prohibited] conduct occurs in part in the United States[.]" 18 U.S.C. § 1956(f)(1).  However, the SSI does not allege either that the defendant was in United States at the time the alleged transactions occurred or that he initiated, or attempted to initiate them, from within the United States.  Nor is it alleged that any of the communications or acts set forth in connection with Counts 18, 19, or 13 occurred in the United States.  Absent such allegations, the Court lacks extraterritorial

jurisdiction over the defendant as to a substantive money laundering offense under § 1956 (Count 18).

Lacking jurisdiction over the defendant as to the substantive offense, the Court must also dismiss both the aiding and abetting and conspiracy counts (Counts 19 and 13, respectively). *Hoskins II*, 902 F.3d at 97; *United States v. Yakou*, 428 F.3d 241, 252 (D.C. Cir. 2005) ("The aiding and abetting statute is not so broad as to expand the extraterritorial reach of the underlying statute."). Independently, as with Count 14 and for the same reason, the Court is of the opinion that a prosecution of the defendant under Counts 18, 19, and 13 violate his Fifth Amendment due process rights. *See Lawrence*, 727 F.3d at 396. Based on the foregoing analysis and discussion, the Court determines that Counts 13, 14, 18, and 19 against the defendant should be, and are hereby, dismissed for lack of jurisdiction, failure to state a claim, due process and vagueness. The Court now proceeds to Section II, the statute of limitations claim for dismissal.

## SECTION II
## STATUTE OF LIMITATIONS CLAIM

### VI.   MOST RELEVANT BACKGROUND FACTS

In January 2012, the Department of Homeland Security ("DHS") commenced an investigation into the business dealing of Rincon and his business partner, Shiera, their affiliates and associates concerning the approval process of PDVSA contracts.   The investigation revealed that by 2013, Rincon and Shiera and their associates had received millions of dollars in bribery/kickback proceeds from PDVSA-related energy and/or equipment contracts, and had used the proceeds to open bank accounts in Switzerland and other countries. As a result, on December 15, 2014, the government issued a MLAT to authorities in Switzerland seeking bank records from several Swiss banks.[11]   According to the government, when Swiss authorities did not promptly respond to the government's request, the government secured a tolling order from the Court on September 21, 2015, that suspended the "running" of the statute of limitations regarding possible crimes committed by Rincon, Shiera and their associates.   *See Tolling Order*, No. 15-MC-2022 (S.D. Tex. Sept. 21, 2015).

On December 10, 2015, a federal grand jury returned a multiple-count indictment against Rincon and Shiera for conspiracy, violations of the FCPA, and violating the MLCA.  In addition to Rincon and Shiera, four other individuals were charged by criminal

---

[11] The MLAT requested records and information in connection with Ovarb Industrial, LLC, Tradequip Services & Marine and its affiliates, Rincon and family members, Shiera, Derwick Associates, Pedro Trebbau Lopez, Leopoldo Alejandro Betancourt Lopez and others.  Specifically, the government sought the records of Swiss banks concerning whether they were used to make payments to Venezuelan government officials.

information with related offenses.  They were charged in November 2015 and January 2016.  However, based on the MLAT request and the criminal charges returned against Rincon, Shiera and others, it is clear that the records received permitted the grand jury to identify various entities and banks that were the depositories of the alleged ill-gotten gains and return an indictment on December 2015.  *United States v. Rincon-Fernandez*, No. 4:15-CR-0654 (S.D. Tex. Dec. 10, 2015), DE 1.

The government then turned its attention to documents and records, presumably, located in the Republic of Panama.  It issued a MLAT to Panamanian authorities on March 14, 2016, specifically identifying documents and persons of interest.  On June 17, 2016, the government, sought and obtained a separate tolling order concerning the Panamanian MLAT.  *See Tolling Order,* No. 16-MC-1346 (S.D. Tex. June 17, 2016).  Like the Swiss MLAT, the Panama MLAT sought records concerning any Rincon/Shiera activities with banks in Panama through which they and their co-conspirators had channeled their ill-gotten gains.  The MLAT requested records for the period of January 1, 2009 to March 14, 2016.[12]

The record shows that the government did not consider the defendant a  target or subject of these two investigations.  In fact, the government does not argue that the September 2015 tolling order, which tolled the statute of limitations for Rincon, Shiera, and others unnamed, tolled the statute of limitations for the defendant.

---

[12] The list of banks for which the government sought records:  Banco Pincha Panama, Banco Trans Atlanto Panama, Banco Columbia Panama, Banco Occidental, Credi-Corp Bank, S.A., Banesco S.A., Banco Lafise Panama, Banco Panamano De La Vivienda, Helm Bank, HSBC Panama, International Union Bank, MMG Bank and Multibank, Incorporated.

On January 12, 2017, the government requested and received a tolling order concerning a MLAT, directed to Swiss authorities, seeking what the government later called supplemental or additional evidence. *See Tolling Order*, 17-MC-0094 (S.D. Tex. Jan. 12, 2017). The evidence does not show when Swiss authorities complied with the request. However, the grand jury returned an indictment on August 23, 2017,[13] and had previously returned an indictment against others based on the same charges on December 10, 2015. *See* No 4:15-CR-0654, DE 1.

On March 5, 2018, under Cause No. 4:15-CR-0654, another MLAT was issued by the government, but on this occasion to Portuguese authorities, seeking interviews with the defendant, Joao Alexandre Rodrigues Silva, and Paula Nacif. Silva and Macif were employees of Banco Espirito Santo S.A. ("BES"). The defendant, although not an employee of BES worked, for a company that managed certain accounts held by BES. *See* [DE 233-3, Ex. C].

The Portuguese MLAT sought information regarding a June 10, 2012, email, presumably from the defendant to Shiera employees identified in the email as "nuestros Amigos". Additionally, the government sought information concerning a March 21, 2013, diagram – a hand-drawn diagram – where the defendant altogether referenced "Amigo" 1, 2, and 3. As well, the MLAT identified the subject matter of the interview. DHS agents sought to connect names to information previously received from various banks and/or entities, and information concerning entities and individuals who allegedly received bribes.

---

[13]*United States v. Leon-Perez et al.,* No. 4:17-CR-514 (S.D. Tex. Aug. 23, 2017), DE 1.

The interview was conducted and completed on March 20, 2018.  On April 24, 2019, the government brought charges against the defendant under the SSI.  *See* DE 129.

## VII.    THE LEGAL STANDARD

The statute of limitations for the crimes charged against the defendant is five years. However, the government may move to suspend the tolling of the statute of limitations during a request of foreign authorities for documents or records that might aid a grand jury in its determination whether there is evidence to indict a person. 18 U.S.C. § 3292.  The relevant portions of the statute state:

> (a)(1) <u>Upon application of the United States, filed before return of an indictment</u>, indicating that evidence of an offense is in a foreign country, <u>the district court before which a grand jury is impaneled to investigate the offense shall suspend the running of the statute of limitations for the offense</u> if the court finds by a preponderance of the evidence that an official request has been made for such evidence and that it reasonably appears, or reasonably appeared at the time the request was made, that such evidence is, or was, in such foreign country. (Emphasis added.)
>
> * * *
>
> (b) Except as provided in subsection (c) of this Section, a period of suspension under this Section shall begin on the date on which the official request is made and end on the date on which the foreign court or authority takes final action on the request. [Emphasis added.]
> (c) The total of all periods of suspension under this Section with respect to an offense—
> (1) shall not exceed three years; and
> (2) shall not extend a period within which a criminal case must be initiated for more than six months if all foreign authorities take final action before such period would expire without regard to this Section.  *Id.*

## VIII.   THE CONTENTIONS OF THE DEFENDANT MURTA

### A.   *The Defendant's Contentions*

The defendant argues that:  (a) the government failed to give him fair notice that he was facing charges for his alleged conduct; (b) § 3292 was abused in the manner and method of its use; (c) the tolling order of January 2017, that permitted the government to extend the statute of limitations, was improvidently granted because, among other reasons: (i) it was entered after an indictment was returned; (ii) the government misled the defendant and his counsel stating that he was merely a witness, causing him to waive his right to remain silent, and; (iii) the offenses for which the defendant was indicted were not the subject of the grand jury investigation at the time; and (d) the government failed, intentionally or otherwise, to account for the duration of the delay in seeking an indictment against him.

### B.   *The Government's Contentions*

In response to the defendant's motion and contentions, the government asserts that the charges against the defendant were timely filed pursuant to § 3292.  It asserts that an "official request" was timely made; that § 3292 is "offense-specific, not person-specific; and, that the government "continued to receive materials from Swiss authorities in response to [the 2017 MLAT] through at least August 20, 2018 . . ."  Hence, the government argues that the government's November 2017, MLAT tolled the statute of limitations into 2020, well after the 2017 indictment was superseded on April 24, 2019, naming the defendant.

## IX.    ANALYSIS AND DISCUSSION

The Court is of the opinion that the defendant's motion to dismiss based on the statute of limitations should be granted.  The record is undisputed in many respects.  The Court is of the opinion that its discussion should start with the application of § 3292 to the 2014 MLAT and the indictment returned on December 10, 2015.

In response to the defendant's limitation claim, the government posits that its 2015 investigation sought records specific to Rincon and Shiera, among others, concerning violations of the FCPA, the MLCA, and for conspiracy to violate these statutes.  *See* [DE 222, at 7].  On December 10, 2015, a grand jury returned indictments against Rincon and Shiera based on, among other things, the records and documents requested of Swiss authorities in the government's December 15, 2014 MLAT.  Hence, the Court concludes the government received the requested document as evinced by the return of an indictment.  On this basis, the Court concludes that the period of suspension dictated by a tolling order ended on a date before the indictment was returned on December 10, 2015.

Under § 3292(b),  a tolling period is satisfied when the foreign authority takes "final action" on the MLAT request. 18 U.S.C. § 3292(b); *United States v. Meador*, 138 F.3d 986, 992 (5th Cir. 1998); *see also Texas Food Indus. Ass'n. v. United States Dep't of Agric.,* 81 F.3d 578, 581–82 (5th Cir. 1996)(a tolling order under § 3292 may toll the statute "before return of an indictment [from the] grand jury . . . impaneled to investigate the offense").  Hence, the statute of limitations tolling ended prior to the December 10, 2015.

Nevertheless, on November 7, 2016, the government issued a second MLAT to Swiss authorities.  It describes this second MLAT as a "supplemental MLAT" in its brief. However, it was not presented to the Court as such.  In fact, it came about a year after the first MLAT was satisfied.  The subject matter and the persons targeted in the second MLAT are the same.  From the government's perspective, the tolling order issued in relation to the 2014 MLAT continued even after an indictment was returned.  This procedure may be appropriate where there is confusion concerning the nature or scope of the MLAT. However, there is no evidence that Swiss authorities sought clarification or additional information regarding the December 14, 2014 MLAT, or that they misunderstood the request, necessitating a supplementation.

The Court also concludes that no evidence has been proffered that the grand jury needed clarification or supplementation concerning the MLAT.  Importantly, nothing in the statute permits the government to issue multiple MLATs simply as a tool to extend tolling, or as a discovery stratagem.  While the statute does not restrict the number of MLATs that the government may issue, it does restrict instances when tolling is authorized. *See* § 3292(a)(1) and (c); *see also Meador*, 138 F.4d at 994 (Section 3292 ". . . should not be an affirmative benefit to prosecutors, suspending the limitations period, pending completion of an investigation . . .").  Based on its massive investigation, the government not only had the ability to be as specific as it desired with its MLATs, it had, in fact, received what it sought. *See United States v. Neill*, 952 F.Supp. 831, 833 (DD.C. 1996).

17 / 25

Therefore, the Court concludes that the permitted period of tolling covers the dates of December 15, 2014, when the MLAT issued, and an undetermined date prior to December 10, 2015, when the grand jury returned an indictment.[14]  In other words, Swiss authorities took "final action" on the government's 2014 MLAT at some point prior to the grand jury's return of an indictment.

The Court concludes that the tolling order pertaining to the January 2017 MLAT was improvidently issued; but even if it was not, it failed to toll the statute concerning the defendant.  An indictment had been returned against Rincon, Sheira and others concerning crimes charged prior to the 2017 indictment.  The record also shows that the grand jury returned even a second indictment charging Rincon and others with violating the FCPA, the MLCA, and conspiracy to violate the Acts —same as the first indictment.

Section 3292 is offense-specific, not person-specific; therefore, the statutory purpose for tolling was exhausted by the 2015 Indictment.  Alternatively, the MLAT did not apply to the defendant.  *Neill,* 952 F.Supp. at 833–34.  The MLAT issued to Portuguese authorities on March 5, 2018, was person-specific and was concluded in two weeks.  Hence, it did not toll § 3292 as to the defendant.  Even if it did, that tolling is inconsequential in light of the fact that final action was completed in two weeks.  *See Gabelli v. SEC,* 568 U.S. 442, 448 (2013); *see also* 18 U.S.C. § 3292(b).  The policy behind section 3292 cannot be shaded to favor the government anymore than to disfavor an accused.  *See Benes v. United States*, 276 F.2d 99, 108–09 (6th Cir. 1960).  Accordingly,

---

[14] It is important to note that the government opted to charge certain individuals by Criminal Information, as well, at least one of which occurred prior to the grand jury indictments.

indicting the defendant in April 2019 means that the indictment was brought outside the statute of limitations and, therefore, Counts 13, 14, 18 and 19 should be and are hereby, dismissed.[15]

## SECTION III.

### The Suppression of Evidence Claim

On February 21, 2022, the defendant filed a motion to suppress statements he allegedly made in an interview with the government in Portugal (DE 265) on March 20, 2018. In his motion, the defendant contends that the government's representations and conduct during the interview were unlawful, pursuant to the Fifth Amendment and *Miranda v. Arizona*, 384 U.S. 436 (1966). The factual background below contains the relevant events that give rise to this motion.

## X.     MOST RELEVANT BACKGROUND FACTS

On March 5, 2018, the DOJ's Office of International Affairs forwarded a MLAT to the Central Authority of Portugal, requesting assistance with coordinating police interviews with three individuals, including the defendant, pursuant to the laws of Portugal and the United States. The MLAT provided a list of interview topics and a request to permit two Department of Homeland Security ("DHS") agents to participate in the interviews. The DHS agents also persuaded the Portuguese officials to refrain from using audio or visual recording devices during the interview.

---

[15] Because the Court has determined that the statute of limitations requires dismissal of the charges against the defendant, the Court finds it unnecessary to resolve the defendant's Speedy Trial Action motion (DE 263).  That motion is, therefore, denied at this time.

On March 15, 2018, the Portuguese Office of the Public Prosecutor issued a formal notice to the defendant instructing him to appear for an interview on March 20, 2018, at a local criminal investigation office, and advising him that he could be accompanied by an attorney. On March 20th, the defendant and his attorney arrived for the interview, which took place in a conference room. Along with the defendant and his attorney, the attendees included a Portuguese Judicial Police Inspector, two DHS agents, and two translators.

The interview started at 10:00 a.m. and continued until 6:50 p.m.  Between those hours, the defendant took a lunch break and two fifteen-minute breaks.  The DHS agents conducted the entire interview, asking all the questions.  According to the defendant, in instances where his answers appeared to them to be untruthful or inaccurate, the agents became argumentative, attempting to persuade him to change his statement(s).

At the start of the interview and on other occasions, the DHS agents assured the defendant that he was a witness and not the target of their investigation.  At or about 4:50 p.m., the defendant reviewed and signed a typed transcription of the interview.  *See* [DE 267, Attach. 1].   At 6:50 p.m., the agents concluded the interview.  Before he left, however, a final assurance was raised that he was a witness, not target.  At no time did the DHS agents inform the defendant that he had the protection of the federal Constitution and could refuse or stop the questioning or not a sign a statement.

## XI.    THE RELEVANT LEGAL STANDARD

When a defendant claims that a statement was involuntary, and that statement is sought to be used against him at trial, "the prosecution must prove by at least a preponderance of the evidence that the [statement] was voluntary." *See Lego v. Twomey,* 404 U.S. 477, 489 (1972); *see also Colorado v. Connelly,* 479 U.S. 157, 168 (1986). Voluntariness is not determined by whether a witness cooperates, but by whether he is apprised of his rights under the law and, in the face of that admonition, answers the officer's questions. Hence, the Fifth Amendment provides an accused with a right against self-incrimination—"no person shall be compelled in a criminal case to be a witness against himself." *See e.g.*, *New York v. Quarles*, 467 U.S. 649, 654 (1984).

In support of this right, *Miranda* provides that a person has the right to remain silent during a custodial interrogation, and prior to any questioning, law enforcement must inform the person of his rights. *Miranda*, 384 U.S. at 458–91. Thus, statements may be suppressed where an officer does not inform a defendant before a custodial interview begins that, under *Miranda*: (1) he has a right to remain silent; (2) statements made can be used against him; and (3) he has a right to have an attorney present during questioning, even if he cannot afford one. *Id*.

A person is deemed to be in custody when, under a reasonable person standard, the individual feels that his freedom has been restricted. *See, e.g., Oregon v. Mathiason*, 429 U.S. 492, 494–95 (1977). In other words, if a reasonable person, in the defendant's position, would have felt that he could not refuse an interview, or could leave the interview

at any time, he is considered to be in custody.  *See id.*; *see also J.D.B. v. North Carolina*, 564 U.S. 261, 268–75 (2011). An interview constitutes an interrogation of a subject when the officer's words or actions are such that the questions asked and the officer's mannerisms are "reasonably likely to elicit incriminating responses from the suspect." *See, e.g., Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The fact that the interview or interrogation occurs in a foreign country does not relax these Fifth Amendment or Miranda protections.  Specifically, when officials from the United States conduct a custodial interrogation in a foreign country, the Fifth Amendment protections extend to the interviewee. *See United States v. Heller*, 625 F.2d 594, 599–600 (5th Cir. 1980); *see also United States v. Yousef*, 327 F.3d 56, 145 (2d Cir. 2003). And, if the agents fail to afford the necessary protections or mislead a foreigner concerning those protections, the exclusionary rule may be invoked, resulting in the suppression of any statements obtained. *See, e.g.*, *Heller*, 625 F.2d at 599–600.

## XII.   CONTENTIONS OF THE PARTIES

### A.  The Defendant's Contentions

The defendant contends that the oral and written statements that he made in Portugal on March 20, 2018, should be suppressed because USHS agents actually conducted a custodial interrogation that violates the Fifth Amendment. The defendant asserts that the interview was custodial because, pursuant to Portuguese law, he was required to comply with the Portuguese summons that directed him to

appear for the interview; he was questioned for nine hours solely by DHS agents; and he reasonably felt, based on Portuguese law, that he was not free to leave. Therefore, he argues, the government violated his Fifth Amendment rights when it failed to inform him of his Miranda rights and, in fact, misled him concerning his status in the context of its investigation.

### B.  The Government's Contentions

In response, the government argues that the defendant's statements should not be suppressed because he was not in custody during his interview.   According to the government, Portuguese law did not require the defendant to appear for questioning. In addition, the government argues, he was free to leave at any time, he received breaks, and the questioning lasted only five hours.  Furthermore, the government posits, on the day of the interview, the defendant was not considered a target of the investigation; he was a witness. For those reasons, the defendant was not entitled to receive Miranda warnings prior to his interview.

## XIII.  ANALYSIS AND DISCUSSION

It is undisputed that DHS agents solely conducted and controlled the defendant's interview in Portugal on March 20, 2018.  The questions asked, in the Court's judgment, were asked in an intimidating manner and were designed to elicit incriminating responses. Otherwise, no written statement would have been necessary.  It is also undisputed that the agents did not read the defendant his Miranda rights before questions, but assured and reassured him that he was not under investigation.   The undisputed evidence shows,

however, that the defendant was questioned while in a custodial environment and status, as such the protections of *Miranda* and the Fifth Amendment apply.

The government has also challenged the defendant's interpretation of Portuguese law regarding whether the defendant was in custody, suggesting that he had the ability to refuse the interview or leave at any time.  However, the government has not provided the Court with an official English translation of the statute in support of its contention or an expert opinion that contradicts the defendant's attorney's interpretation.  Conversely, in an affidavit, the defendant's counsel stated that Portuguese law required the defendant's attendance, even as a "witness", to appear and remain in the interview until the questioning was concluded.

Attachment Number One to the defendant's amended motion to dismiss [DE 267], provides in relevant part:

> I, Henrique Salinas, declare the following about Mr. Paulo Murta and my involvement with his case. I am a lawyer and partner in the CCA Law Firm, based in Portugal. Attached as Exhibit I to this declaration is my curriculum vitae. I have represented Paulo Murta since the beginning of 2018.
>
> On March 20, 2018, I attended an interview with Mr. Murta in Portugal. We went because Mr. Murta had been notified that he was required to appear at a specific criminal investigations office on that date. Under Portuguese law, Mr. Murta was required to attend that meeting. When a person is a witness in a criminal investigation, rather than a suspect, the person is required to attend the meeting, and the person can even be arrested in case of non-appearance. If the person does not appear, the person is committing a crime. Neither Mr. Murta nor I knew the reason for this particular meeting. All we knew is that the meeting was not related to any ongoing Portuguese investigation, because the law would have required the authorities to provide me, as his attorney, with advance notice if the inquiry was about the pending investigation.

. . .

Under Article 58 of the Portuguese Code of Criminal Procedure, it is mandatory that a person be formally given the status of defendant as soon as he makes statements during an inquiry against him when there are grounds to suspect that he committed a criminal offense. Under Article 59(1), if during an interview with a person other than a defendant, grounded suspicions arise that the person committed a criminal offense, the authority conducting that interview must immediately suspend the interview and proceed to the communication and advice in Article 58. If those rules are not followed, Article 58 prohibits the use of the person's statements as evidence. That did not happen at any time during Mr. Murta's interview with American agents on March 20, 2018. Even at the end of the meeting, the American agents reiterated that Mr. Murta was merely a witness.

Thus, a reasonable person in the defendant's position would not have felt that he could leave the interview voluntarily.  For all the reasons stated, heretofore, the defendant's motion to suppress any oral and/or written statements made to Portuguese or DHS agents should be, and they are hereby, suppressed.

It is, therefore, ORDERED that the defendant's motion to dismiss is Granted.

SIGNED on July 11, 2022, at Houston, Texas.

Kenneth M. Hoyt
United States District Judge